Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 351395 (S.D.N.Y.)
(Cite as: 2000 WL 351395 (S.D.N.Y.))

Page 1

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Chaim GREENFELD, et al. Plaintiffs,
v.
MEMORIAL SLOAN KETTERING HOSPITAL, et al. Defendants.
No. 95 Civ. 7658 KTD.

April 5, 2000.

Joseph Yerushalmi, Eldad Gal, Yerushalmi & Associates, LLP, New York, NY, for Plaintiffs.

Esther S. Widowski, Roderick J. Cassidy, Widowski Cassidy & Steinhart, LLP, New York, NY, for Defendants.

*MEMORANDUM & ORDER*

DUFFY, J.

*1 Defendants Memorial Sloan Kettering Hospital, Dr. Farid Boulad, John Does 1-9, and Dr. Philip R. Exelby (collectively "the Hospital") move for summary judgment on all the claims. The Defendants also move to quash a Requests for Admissions served on April 19, 1999 and for associated sanctions. Finally, Defendants move for an order striking Chaim Greenfeld's Affidavit. Conversely, the Plaintiffs have moved for summary judgment on all claims based on the thawed bone marrow.

For reasons stated below the Defendants' motion for summary judgment is granted in part and denied in part. The Plaintiffs' motion for summary judgment for claims based on the thawed bone marrow is denied. The Defendants' motion to strike portions of the Greenfeld affidavit is denied. Finally, the Defendants' motion to quash the request for admissions is denied as is the request for associated sanctions. However, neither party may make any future requests for admissions or use any other device designed to elicit information from the opposing party without first obtaining leave of the court.

Background

In October 1991, Israeli resident Or Greenfeld, age three, after being diagnosed with Leukemia was admitted to Memorial Sloan Kettering Hospital in New York for chemotherapy treatments. On November 3, 1991 Or went into a remission but three days later was found to be in relapse and started receiving high dose chemotherapy. Over the next five months Or went into another remission followed by a relapse but continued to receive chemotherapy in high doses.

On April 22, 1992 Or went into his third remission but stayed on chemotherapy. On May 26, 1992 Or was accepted by the Hospital as a candidate for a bone marrow transplant. Two days later Or underwent an autologous bone marrow harvest. In this operation Or's own marrow was suctioned out for the purpose of having it around in case an emergency need arises during or after the bone marrow transplant such as rejection of the donor marrow. The harvesting operation lasted about 1.5 hours.

From June to November 1992 Or returned to Israel and continued to receive chemotherapy in preparation for his bone marrow transplant ("BMT") operation. On August 14, 1992 a donor was found for Or who was considered

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 3:01-cv-01090-WWE    Document 126-7    Filed 06/23/2008    Page 2 of 10

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2000 WL 351395 (S.D.N.Y.)
(Cite as: 2000 WL 351395 (S.D.N.Y.))

acceptable by the transplant physician Dr. Boulad. On September 24, 1992 a meeting was scheduled with the donor to obtain her consent. On October 15, 1992 after consenting, the donor submitted to tests and it was discovered that she had a platelet count of 147,000. [FN1] On the same day Or received high does chemotherapy treatments and also received further treatments on October 29, 1992.

> FN1. Although there is some dispute over the significance of a 147,000 count, this is apparently a below normal count but does not indicate, on its own, a problem that would prevent the BMT operation.

The BMT operation was scheduled for December 2, 1992 with cytoreduction [FN2] to begin on November 23. On October 30, 1992 the donor was medically cleared for the operation. On November 10, the hospital made a request for another platelet count from the donor. The same day, Or arrived from Israel and started receiving intensive chemotherapy in anticipation of the BMT operation. On November 12 an aspirate revealed that Or had an average of 7% blast, an indication that he might be in the early stages of a third relapse. On November 19, 1992 Or underwent an operation to remove a single lumen broviac catheter and insert a double lumen broviac catheter in anticipation of the upcoming BMT operation. [FN3] The same afternoon it was determined that the Donor's blood platelet count was 139,000 and the hospital decided to postpone the BMT until a bone marrow aspirate was performed. On November 23, 1992, Dr. Boulad requested a further evaluation of the Donor. Also on November 23, Or's double lumen broviac catheter unexpectedly dislodged.

> FN2. Cytoreduction means the destruction of the patient's bone marrow; this is necessary before receiving the donor's marrow. The destruction is accomplished through total body irradiation, including radiation to the head and chemotherapy.

> FN3. Having the double lumen broviac catheter would facilitate chemotherapy treatment in higher doses.

*2 On December 11, the Donor underwent further evaluation and it was determined that she had Mild Chronic Idiopathic Thrombocytopenia Purpura. [FN4] At this time Or was sent back to Israel and continued Chemotherapy treatments. The transplant operation was rescheduled for February 1993. In January 1993 Or underwent another surgical procedure in Israel for the reinsertion of the double lumen broviac catheter. When Or returned to the Hospital for the BMT operation they discovered that he had Acute Hepatitis B and canceled the February operation. On June 15, 1993, despite a lower donor platelet count of 123,000 the operation was rescheduled in Israel for July 1993.

> FN4. This disease would not prevent a BMT operation from proceeding but the donor was unavailable from December 2, 1992 until February 1993. It is the Plaintiffs' contention that the Hospital knew of the donor's unavailability and was negligent in not investigating the situation properly and not acting swiftly before the donor became unavailable which led to extensive delays.

On June 21, 1993 Chaim Greenfeld, Or's father, arrived at the hospital to retrieve Or's harvested marrow for the BMT now scheduled in Israel. Unknown to Chaim, the marrow had accidentally thawed but was given to him anyway. It was later disclosed that the marrow had thawed and was not suitable for the operation. The operation went ahead as scheduled in Israel. Today, Or Greenfeld has no signs of the Leukemia but is allegedly mentally disabled.

Claims

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 351395 (S.D.N.Y.)
**(Cite as: 2000 WL 351395 (S.D.N.Y.))**

Page 3

The first claim recites the facts with specific emphasis on thawed bone marrow and accuses the Hospital of negligence that rendered the operation a complete waste and caused Or unnecessary pain and suffering. It claims damages for the pain and cost associated with Or's May 28, 1992 autologous marrow harvest operation.

The second claim focuses specifically on the November 19, 1992 operation whereby the single lumen broviac catheter was replaced with a double lumen broviac catheter ("the catheter replacement operation"). It claims that the operation was done negligently which lead to delays in the BMT operation, which, in turn, led to Or's brain damage. It alleges that the negligence also caused significant pain as well as extra costs.

The third claim accuses the Hospital of not informing the Greenfelds of the necessity of the operation to replace the single lumen broviac catheter with a double lumen broviac catheter until it was too late to have the operation in Israel. This meant that the Greenfelds had to pay for the operation instead of having their insurance pay for it. Therefore, the Greenfelds are entitled to reimbursement from the Hospital.

The fourth claim is similar to the first claim except that it accuses the hospital of *intentionally* not telling the Greenfelds that the bone marrow had thawed until right before the operation and claims that this led to delays which, in turn, caused brain damage and led to physical and emotional distress. The Plaintiffs have since voluntarily withdrawn the claim for intentional infliction of emotional distress.

The fifth claim is based on breach of contract and was withdrawn by the Plaintiffs in the answer to the summary judgment motion.

The Plaintiffs filed a motion to amend the complaint by adding claims for lack of informed consent on July 3, 1997. The Defendants opposed the amendment and I denied the Plaintiffs' motion. Therefore, despite the Plaintiffs' insistence that a claim for informed consent exists, [FN5] it does not because it was never properly pled.

> FN5. The Plaintiffs have included these claims in the joint pretrial order filed on May 5, 1999. This totally contradicts the order I issued on January 1, 1998 denying the Plaintiffs' motion to amend the complaint.

*3 Also, due to the Plaintiffs' failure to comply with discovery deadlines regarding his expert witnesses I issued an order on May 3, 1999 which barred them from presenting expert testimony at trial. However, the order allowed for Or's treating physicians to testify as non-experts.

New York Law Applies

Both parties have relied on New York law in their briefs. (*See* Plaintiffs' Memorandum of Law in Support of Motion to Amend, dated June 1, 1997; Defendants' Memorandum of Law in Support of Motion for Summary Judgment dated August 6, 1999). Precedent in this Circuit holds that such reliance amounts to implied consent to New York law. *See Tehran-Berkeley Civil and Envtl. Eng's v. Tippetts-Abbett-McCarthy-Stratton,* 888 F.2d 239, 242 (2d Cir.1989). Furthermore, the conduct alleged to support the Plaintiffs' claims took place in New York. "[I]t is more than likely that it is the law of the place of the tort which will be controlling ... [L]ex loci delicti remains the general rule in tort cases to be displaced only in extraordinary circumstances." *Lund's, Inc. v. Chemical Bank,* 870 F.2d 840, 845 (2d Cir.1985) (internal quotations omitted). So while it is true that the Plaintiffs are not New York domiciliaries, it is clear that New York law governs this case.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 3:01-cv-01090-WWE   Document 126-7   Filed 06/23/2008   Page 4 of 10

Not Reported in F.Supp.2d    Page 4
Not Reported in F.Supp.2d, 2000 WL 351395 (S.D.N.Y.)
(Cite as: 2000 WL 351395 (S.D.N.Y.))

Motion to Strike Chaim Greenfeld's Affidavit

The Defendants' motion to strike Chaim Greenfeld's Affidavit is meritless. The affidavit was submitted in support of the Plaintiffs' response to this summary judgment motion brought by the Defendants. First, I can state without hesitation that there is nothing unique in this affidavit that affected my decision regarding summary judgment, therefore the motion to strike is largely moot. More importantly, the affidavit, contrary to the representation of the defendants, does not violate the rules of evidence.

Most of the objections the Defendants raise in response to the affidavit are based on the hearsay rules. The Defendants assert that the affidavit is not based on Chaim's personal knowledge but rather on things told to him by physicians so it is hearsay. This ignores two well settled principles clearly promulgated by the Federal Rules of Evidence. First, many of the statements in Greenfeld's affidavit are not important as proof of their truth but rather are only important to show that Chaim was or was not told something by Or's treating physician. Second, the representations by Greenfeld of what Or's treating physicians told him are statements by a party opponent since those physicians are either Defendants in this case or were working for the Hospital.

When something is not offered for its truth it is not considered hearsay under the federal rules. *See* Fed.R.Evid. 801(c) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."); *see also United States v. Aponte,* 31 F.3d 86, 88 (2d Cir.1994). Whether the Greenfelds were told of possible delays in the upcoming bone marrow operation is certainly central to the issues in this lawsuit. The underlying facts associated with the affidavit are largely uncontested by the Plaintiffs anyway so it is obviously unnecessary for the affidavit to offer the events described to prove their truth.

*4 In their reply brief the Defendants assert that if the Plaintiffs are indeed offering the affidavit to show what the Greenfelds were or were not told rather than the truth of the matters asserted, then it is also inappropriate because my January 1, 1998 order barred amending the complaint to allow a claim for informed consent. The Defendants misunderstand the distinction between a general claim of negligence for medical malpractice and a claim for lack of informed consent. A physician can be liable under a negligence malpractice claim by not informing or misinforming his patient provided that he breached medically accepted standards and the breach was the proximate cause of the harm claimed. It is true that a claim for informed consent might also arise in such a situation but that is irrelevant to this analysis.

A claim for lack of informed consent is actually a variation on the tort of battery. *See generally* Laurent B. Frantz, *Modern Status of Views as to General Measure of Physician's Duty to Inform Patient of Risks of Proposed Treatment,* 88 A.L.R.3d 1008 (1978); *see also Fogal v. Genesee Hosp.,* 344 N.Y.S.2d 552, 559 (1973). When the patient is not properly informed of the full ramifications of the medical treatment in accordance with sound medical practice then the treatment constitutes a technical battery and the plaintiff may recover damages proximately caused *by the treatment,* rather than caused by the communication or lack thereof. [FN6] Here, the affidavit is relevant to the negligence cause of action as originally claimed in Plaintiffs' complaint for both the situation where the catheter dislodged and the determination of whether delays were caused by the Defendants.

> FN6. This is not to say that the Defendants might not have committed negligence in performing a related operation or otherwise rendering direct medical treatment. The distinction is that in a claim for lack of informed consent, if the plaintiff proves consent was not properly given then regardless of whether the associated treatment was negligent, the defendant will be liable for damages caused by that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

treatment. Under a negligence theory, the treatment itself must be negligent in order to recover for damages solely caused by that treatment.

The Defendants' hearsay objections relate to parts of the affidavit that convey Or's medical treatment either told to the Greenfelds by the treating physicians or witnessed by the Greenfelds. In either case the affidavit testimony is not hearsay. "A statement is not hearsay if ... [a] statement is offered against a party and is (A) the party's own statement, in either an individual or representative capacity." Fed.R.Evid. 801(d). Furthermore, contrary to the Defendants' assertions, Chaim is competent to testify to treatment he witnessed first hand despite not being a medical doctor. Unfortunately many families are faced with severely ill children and it would be insulting to suggest that concerned parents cannot familiarize themselves with a thorough understanding of the medical treatment received by their children. There is nothing here to suggest that Chaim Greenfeld did not understand the treatment received by Or and his affidavit testimony will stand.

Request for Admissions

The Plaintiffs served a Request for Admissions on the Defendants on May 11, 1999. The request came about 40 days after the close of discovery since the deadline for discovery was March 30, 1999, and for that reason the Defendants have filed a motion for a protective order and sanctions. Because I find that a Request for Admissions is not a discovery device as contemplated by the November 13, 1998 scheduling conference, the present motion is denied and the Defendants are hereby ordered to answer the Request for Admissions within 30 days.

*5 Both sides cite seemingly contradictory case law from within this circuit regarding whether Requests for Admissions are discovery devices and therefore limited by discovery deadlines. *See Carousel Candy Co. v. Weber,* 38 B.R. 927, 935-36 (Bankr.E.D.N.Y.1984) ("[T]he Court holds that the defendant BATES' objection to plaintiff's Requests for Admission on the ground that they were served on defendants after the date by which all discovery was to be concluded is without merit. Requests for Admissions, pursuant to FRCP 36, are in the nature of a Pre-Trial Order in that they are designed to narrow issues and eliminate those over which there is no dispute. They are not designed to be a discovery device ..."). *Compare Bailey v. Broder,* No. 94-2394, 1997 WL 752423, at *3 (S.D.N.Y. Dec. 5, 1997) ("[R]equests for admissions are to be made within the discovery deadline.") There is apparently no clearly defined precedent on this point from the Second Circuit so the important issue here is whether Requests for Admissions were contemplated as part of discovery in the November 13, 1998 scheduling conference.

During the scheduling conference I asked each side how many depositions they had remaining. I also inquired about how many documents still needed to be turned over and when that could be accomplished. Based on this information I suggested a discovery deadline date of March 30, 1999 to which both parties agreed. Never during the conference did the subject of Admissions come up nor were they contemplated. So, for the purposes of the November 13, 1998 scheduling conference, Requests for Admissions were not deemed part of the discovery schedule and I will not now bar the Plaintiffs' Request based on that schedule. Furthermore, the Plaintiffs claim, and I have no reason to doubt, that many of the requests are based on a document they received on March 19, 1999. So, given the number of documents turned over in this case, the circumstances surrounding the timeliness of the request are reasonable.

Since the motion for a protective order is denied it is unnecessary to discuss sanctions.

The Defendants have raised the concern that unless the Plaintiffs are sanctioned they will continue to bombard the Defendants with discovery and associated requests. It is true that both sides in this case, but particularly the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                            Page 6
Not Reported in F.Supp.2d, 2000 WL 351395 (S.D.N.Y.)
**(Cite as: 2000 WL 351395 (S.D.N.Y.))**

Plaintiffs, have been uncooperative and untimely with such requests. Therefore, neither party shall serve any sort of device designed to elicit information or admissions, discovery or otherwise, on the opposing side without first obtaining my leave. Such leave will not be granted unless a good cause is shown.

Defendants' Summary Judgment Motion

The Defendants move for summary judgment on several grounds, some of which relate only to specific claims. Each of the grounds is discussed below.

Summary Judgment Standard

Summary Judgment under Fed. R. Civ. P. 56(c) is only appropriate if no genuine issue of material fact exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The facts should be viewed in the light most favorable to the non-moving party. However, mere conclusory allegations will not suffice to overcome summary judgment. *See Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 100 (2d Cir.1997). "In a medical malpractice action, [summary judgment is appropriate if] there is no genuine issue of fact as to whether defendant's actions were both a departure from the accepted standard of care in the medical community as well as a proximate cause, i.e., a substantial factor, in bringing about plaintiff's injury." *Thompson v. Beth Israel Med. Ctr.*, No. 96-0509, 1999 WL 228387, at *2 (S.D.N.Y. Apr. 19, 1999).

Expert Testimony

*6 The Defendants contend that all the Plaintiffs' claims sounding in medical malpractice, the First, Second, and Forth Causes of Action, should be dismissed because of my May 3, 1999 order which bars the Plaintiffs from presenting expert witnesses at trial. The Defendants argue that under New York law, expert testimony is required to establish a prima facie case. I find the Defendants' argument unconvincing.

The Defendants have misunderstood or misconstrued the scope and effect of my May 3, 1999 order. The order still allows the Plaintiff to present testimony from doctors that treated Or as "lay witnesses". What is meant by "lay witnesses" is that these are witnesses that have not examined Or or his medical condition with the specific purpose of rendering an opinion for this litigation. Rather, these physicians, Dr. Shimon Slaven and Dr. Yitchak Frank, who have actually treated Or because of medical necessity will be allowed to testify about such treatment. This allowable testimony includes anything that has come within their professional scope as a treating physician such as probable causes, past and present conditions, and future treatments.

The Defendants are under the false impression that no testimony, even from Or's treating physicians, can contain technical medical explanations or opinions. Since this is not the case, Defendants' motion for summary judgment based on the absence of "expert" testimony holds no weight as there will likely be testimony from physicians presented by the Plaintiff that may or may not make out a prima facie case of medical malpractice. This testimony can certainly be considered in making factual determinations.

Furthermore, contrary to the Defendants' representation, New York law only requires expert testimony to prove a case of medical malpractice based on *lack of informed consent*. "Although § 4401-a of the New York CPLR requires expert testimony 'as to any cause of action for medical malpractice based solely on lack of informed consent', this requirement applies only to causes of action [based] *Solely* on lack of informed consent. Accordingly, while sound litigation strategy would normally include additional expert medical testimony, this plaintiff was not subject to dismissal for failure to introduce such testimony." *Ezagui v. Dow Chemical Corp.*, 598 F.2d

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2000 WL 351395 (S.D.N.Y.)  
**(Cite as: 2000 WL 351395 (S.D.N.Y.))**

Page 7

727, 737 (2d Cir.1979) (emphasis added). Here, as previously discussed, no such claim for lack of informed consent exists. Therefore, the Defendants' motion to dismiss all the medical malpractice claims based on the expert testimony bar is denied.

Claim 3--The Catheter Replacement Operation

The Defendants assert that claim 3, which deals with the catheter replacement operation, is not cognizable under New York law. Claim 3 contends that the hospital is liable to the Greenfelds because they did not inform them of the need for the catheter operation in a timely manner which precluded Or from having the operation in Israel where it would have been covered under the Greenfeld's insurance.

*7 The Defendant argues that the hospital has no legal duty to perform an international price comparison and there is no supporting case law or statute that would authorize such a duty. This assertion misses the point. The Hospital does have a duty to inform its patients of medically necessary operations in a timely manner consistent with sound medical practices. If the Hospital breached this duty then it will be held accountable for any damages that were proximately caused by the breach. "Proximate cause is often described as that which in a natural and continuous sequence, unbroken by any new cause, produces the event, and without which that event would not have occurred.... Moreover, proximate causation requires that the injury be a 'reasonably foreseeable result of the negligence." ' *Lamarca v. United States,* 31 F.Supp .2d 110, 126 (E.D.N.Y.1998) (citations omitted). So there are two issues that need to be settled at trial for this claim. 1) Whether the Hospital informed the Greenfelds of the need for catheter replacement operation in a manner that was consistent with sound medical practices. 2) If not, then whether the breach of this duty directly resulted in the Greenfeld's having to pay the cost of the catheter replacement operation and whether this was a foreseeable consequence of the breach.

Accordingly, the motion to dismiss Claim 3 with regard to the damages claimed for the cost of the catheter replacement operation is denied.

Punitive Damages

The Defendants have also moved to dismiss any claim for punitive damages associated with the catheter replacement operation. The motion is granted.

In order to properly claim punitive damages in a medical malpractice suit the plaintiff must show that the defendant acted with a wrongful motive, willful misdeed or reckless indifference. *See Ambassador Faith Whittlesey v. Espy,* No. 96-0671, 1996 WL 689402, at *1 n. 2 (S.D.N.Y. Nov. 26 1996).

There is nothing alleged by the Plaintiffs nor is there anything in the record which would show that the Defendants acted willfully, recklessly or with an evil motive. Accordingly, there can be no punitive damages associated with the catheter replacement operation.

The Thawed Bone Marrow

Several of the claims involve the thawed bone marrow. Both sides have moved for summary judgment on these claims. The Defendants assert that such claims are based on medical malpractice which may only be proved through expert testimony and since the Plaintiff is barred from presenting such testimony, summary judgment is appropriate. As discussed previously, I do not find any merit in this assertion.

The Plaintiffs contend that the Hospital has admitted that the thawing incident occurred in contravention to ac-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 3:01-cv-01090-WWE   Document 126-7   Filed 06/23/2008   Page 8 of 10

Not Reported in F.Supp.2d                                                                                                Page 8
Not Reported in F.Supp.2d, 2000 WL 351395 (S.D.N.Y.)
(Cite as: 2000 WL 351395 (S.D.N.Y.))

cepted medical standards and is therefore entitled to summary judgment on its claims. I agree that the Hospital had a duty to maintain the bone marrow and breached that duty and there are no material facts in dispute regarding the underlying events that would lead to any other conclusion. However, the issue here is whether the breach was the proximate cause of Plaintiffs' damages.

*8 There are several distinct claims of damage arising from the thawed marrow event. First, the Plaintiffs contend they are entitled to the airfare and time spent by Chaim Greenfeld when he flew from Israel to retrieve the marrow.

I find that there are still issues of material fact that must be resolved before the Plaintiffs can succeed on their claim for the cost of the plane fare and Chaim Greenfeld's time in retrieving the thawed marrow. The first is whether the marrow was medically necessary or useful. There is some evidence to indicate that the bone marrow that thawed was not needed for the subsequent BMT operation. The fax from Dr. Slavin dated June 23, 1993, states that the loss of the bone marrow was not a problem because there was another marrow aspirate available. However, this is contradictory to the actions of Chaim Greenfeld, apparently acting with some urgency in flying to New York to retrieve the frozen marrow. Furthermore, it is possible that Dr. Slavin was mistaken or that having a second marrow backup was more desirable to having only one. If there was a medical use for the marrow then it is clear that the trip was otherwise not in vain and the Hospital's breach would be the proximate cause of the trip being rendered a waste.

However, even if there was no use for the marrow the Hospital still owed the Greenfelds a separate duty to inform them in a timely manner that the marrow had thawed. It is still unclear from record exactly when the marrow thawed. If it was on the same day, June 21, 1993 then it would have been impossible for them to tell Chaim in time to prevent the wasted flight to New York. If, on the other hand, there was reasonable time to inform Chaim that the marrow had thawed then the Hospital will be liable for the cost of the flight and Chaim's time because, but for their breach, the flight would not have taken place regardless of the usefulness of the marrow.

Next, the Plaintiffs are asking for the cost and associated pain of Or's autologous marrow harvest operation since the subsequent thawing rendered it a waste. This issue likewise cannot be determined on summary judgment because there is still a material question of fact in dispute. Specifically, whether the Hospital's breach of its duty either endangered Or or caused him to have to undergo an extra operation. The issue discussed above of whether the marrow was medically useful is also determinative here. If the marrow was really unnecessary then the thawing would not be the proximate cause of vitiating the effect of the prior harvesting operation. If on the other hand, there was a medical need for the marrow, even if it was only as a second backup, the operation would have been rendered a waste *because of the Hospital's negligence.* Stated another way, the Hospital's breach of its duty would be the proximate cause of rendering the operation a waste if the marrow was medically useful and therefore, the Hospital would be liable for the cost of the operation and Or's pain and suffering.

*9 Accordingly, the Plaintiffs' motion for summary judgment is denied. However, regarding the marrow incident I find that the hospital had a duty to preserve the marrow, they breached that duty, and they also had a duty to promptly inform Chaim that the marrow had thawed. Causation still needs to be resolved at trial for both the damages relating to the plane fare and the damages for the cost of the harvesting operation and Or's associated pain and suffering. Also to be resolved at trial is the issue of whether the Hospital breached its duty to promptly inform the Greenfelds that the marrow had thawed.

The Plaintiffs also seem to contend in claim 1 and in claim 4 that the delays associated with the thawing led to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

more chemotherapy treatments and that this, in turn, led to Or's brain damage. I find no merit whatsoever in this claim. The operation was already scheduled for July 7, 1993 when Chaim went to retrieve the frozen marrow. According to the pleadings, the operation went off in July as planned and was a success. (*See* Joint Pretrial Order dated May 5, 1999 p. 20, Joint Stipulated Facts). The thawed bone marrow was never needed. There are no material issues of fact in dispute here. Had the marrow been stored properly the operation would still have been performed at the same time so the thawing cannot be the proximate cause of Or's alleged brain damage. Accordingly, Summary Judgment is granted for the Defendants with regard to the issue of whether the thawed bone marrow lead to Or's alleged brain damage.

Defendants also contend that, to the extent if any that claim 4 asserts a cause of action for negligent infliction of emotional distress, [FN7] it should be dismissed because there was no direct threat of physical harm. New York case law clearly supports Defendants' position. There are two theories upon which a case for negligent infliction of emotional distress can be established, the bystander theory and the direct duty theory. *See Mortise v. United States,* 102 F.3d 693, 696 (2d Cir.1996). Here, the Plaintiff cannot meet its burden under either theory.

> FN7. The Plaintiffs have withdrawn their claim for intentional infliction of emotional distress so it is unnecessary to address the Defendants' arguments on this point.

Under the bystander theory the plaintiff must be 1) threatened with physical harm and 2) consequently suffer emotional injury by witnessing the death or serious bodily injury of a member of her immediate family. *See id.* Here, neither prong is met as the bone marrow thawing did not threaten Or's parents and there were no physical consequences to anyone.

Under the direct duty theory a plaintiff can only recover if she suffers an emotional injury from defendant's breach of a duty which unreasonably endangered *her own physical safety. See id.* Here, it is Or's parents that are claiming emotional harm from the bone marrow thawing and not Or because he was too young to understand the implications of the thawing and could not otherwise have been emotionally damaged from the event. The parents cannot succeed under the direct duty theory because their physical safety was never threatened.

*10 Furthermore, in order to support a negligent infliction of emotional distress claim the defendant's conduct in question must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Karl v. Asarco Inc.,* 166 F.2d 1200, 1200 (2d Cir.1998) (internal quotations omitted). Here, nothing has been alleged regarding the bone marrow incident that would rise to this severe level.

Therefore, Plaintiffs' claim for negligent infliction of emotional distress relating to the thawed bone marrow is dismissed.

Summary

The Defendants' motion to strike Chaim Greenfeld's Affidavit is denied. Also, the Defendants' motion to quash the Plaintiffs' Request for Admissions is denied and the Defendants are hereby ordered to answer within thirty days. The Defendants' motion for summary judgment is granted for the claim of punitive damages, the claim that the bone marrow incident led to Or's alleged brain damage, and the claim for negligent infliction of emotional distress. The Defendants' summary judgment motion contending that all medical malpractice claims should be dismissed because of the absence of expert testimony is denied. Also, the Defendant's motion to dismiss the claim for the catheter replacement operation is denied. Finally, the Plaintiffs' motion for summary judgment on the bone marrow thawing claim is denied.

Not Reported in F.Supp.2d                                                                                      Page 10
Not Reported in F.Supp.2d, 2000 WL 351395 (S.D.N.Y.)
**(Cite as: 2000 WL 351395 (S.D.N.Y.))**

SO ORDERED.

Not Reported in F.Supp.2d, 2000 WL 351395 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.